# UNITED STATES *v.* VUITCH

No. 84.  Argued January 12, 1971—Decided April 21, 1971

Black, J., delivered the opinion of the Court, in Part I of which Burger, C. J., and Douglas, Stewart, and White, JJ., joined, and in Part II of which Burger, C. J., and Harlan, White, and Black-mun, JJ., joined.  White, J., filed a concurring opinion, *post,* p. 73.  Douglas, J., filed an opinion dissenting in part, *post,* p. 74.

HARLAN, J., filed an opinion dissenting as to jurisdiction, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, *post,* p. 81. STEWART, J., filed an opinion dissenting in part, *post,* p. 96. BLACK-MUN, J., filed a separate opinion, *post,* p. 97.

*Samuel Huntington* argued the cause for the United States. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Wilson, Jerome M. Feit,* and *Roger A. Pauley.*

*Joseph L. Nellis* and *Norman Dorsen* argued the cause for appellee. With *Mr. Nellis* on the brief was *Joseph Sitnick.*

Briefs of *amici curiae* were filed by *David W. Louisell* for Dr. Bart Heffernan; by *Alfred L. Scanlan, Thomas J. Ford,* and *Gary R. Alexander* for Dr. William F. Colliton, Jr., et al.; by *Robert E. Dunne* for Robert L. Sassone; by *Marilyn G. Rose* for the National Legal Program on Health Problems of the Poor; by *Sylvia S. Ellison* for Human Rights for Women, Inc.; by *Lola Boswell* for the Joint Washington Office for Social Concern et al.; and by *Ralph Temple, Melvin L. Wulf,* and *Norma G. Zarky* for the American Civil Liberties Union et al.

MR. JUSTICE BLACK delivered the opinion of the Court.*

Appellee Milan Vuitch, a licensed physician, was indicted in the United States District Court for the District of Columbia for producing and attempting to produce abortions in violation of D. C. Code Ann. § 22–201 (1967). Before trial, the district judge granted Vuitch's motion to dismiss the indictments on the ground that the District of Columbia abortion law was unconstitutionally vague. 305 F. Supp. 1032 (DC 1969). The United States ap-

---

*THE CHIEF JUSTICE, MR. JUSTICE DOUGLAS, MR. JUSTICE STEWART, and MR. JUSTICE WHITE join in Part I of this opinion. THE CHIEF JUSTICE, MR. JUSTICE HARLAN, MR. JUSTICE WHITE, and MR. JUSTICE BLACKMUN join in Part II of this opinion.

pealed to this Court under the Criminal Appeals Act, 18 U. S. C. § 3731. We postponed decision on jurisdiction to the hearing on the merits, 397 U. S. 1061, and requested the parties to brief and argue specified questions on that issue. 399 U. S. 923. We hold that we have jurisdiction and that the statute is not unconstitutionally vague. We reverse.

## I

The first question is whether we have jurisdiction under the Criminal Appeals Act to entertain this direct appeal from the United States District Court for the District of Columbia. That Act[1] gives us jurisdiction over direct appeals from district court judgments "in all criminal cases . . . dismissing any indictment . . . where such decision . . . is based upon the invalidity . . . of the statute upon which the indictment . . . is founded." 18 U. S. C. § 3731. The decision appealed from is a dismissal of indictments on the ground that the District of Columbia abortion law, on which the indictments were based, is unconstitutionally vague. This abortion statute, D. C. Code Ann. § 22–201, is an Act of Congress applicable only in the District of Columbia and we suggested that the parties argue whether a decision holding unconstitutional such a statute is appealable directly to this Court under the Criminal Appeals Act. The literal wording of the Act plainly includes this statute, even though it applies only to the District. A piece of legislation so limited is nevertheless a "statute" in the sense

---

[1] The Act states in pertinent part:

"An appeal may be taken by and on behalf of the United States from the district courts direct to the Supreme Court of the United States in all criminal cases in the following instances:

"From a decision or judgment setting aside, or dismissing any indictment or information, or any count thereof, where such decision or judgment is based upon the invalidity or construction of the statute upon which the indictment or information is founded." 18 U. S. C. § 3731.

that it was duly enacted into law by both Houses of Congress and was signed by the President. And the Criminal Appeals Act contains no language that purports to limit or qualify the term "statute." On the contrary, the Act authorizes Government appeals from district courts to the Supreme Court in *"all criminal cases"* where a district court judgment dismissing an indictment is based upon the invalidity of the statute on which the indictment is founded.

An examination of the legislative history of the Criminal Appeals Act and its amendments suggests no reason why we should depart from the Act's literal meaning and exclude District of Columbia (hereafter sometimes D. C.) statutes from its coverage. The committee reports and floor debates contain no discussion indicating that the term "statute" does not include statutes applicable only to the District of Columbia.[2] We therefore conclude that we have jurisdiction over this appeal under the Criminal Appeals Act.

Our Brother HARLAN has argued in dissent that we do not have jurisdiction over this direct appeal. He suggests that such a result is supported by the decision in *United States* v. *Burroughs,* 289 U. S. 159 (1933), the policy underlying the Criminal Appeals Act, and the canon of construction that statutes governing direct appeals to this Court should be strictly construed.

It is difficult to see how the *Burroughs* decision lends much force to his argument, since that case held only that the term "district court" in the Criminal Appeals Act did not include the then-existing Supreme Court of the District of Columbia. *Id.,* at 163–164. The dissent goes on to suggest the Act should be construed in light of the

---

[2] See H. R. Conf. Rep. No. 8113, 59th Cong., 2d Sess.; H. R. Rep. No. 2119, 59th Cong., 1st Sess.; H. R. Rep. No. 45 and S. Rep. No. 868, 77th Cong., 1st Sess.; H. R. Conf. Rep. No. 2052, 77th Cong., 2d Sess.

congressional purpose of avoiding "inconsistent enforcement of criminal laws." *Post*, at 92. This purpose would not be served by our refusing to decide this case now after it has been orally argued. In the last several years, abortion laws have been repeatedly attacked as unconstitutionally vague in both state and federal courts with widely varying results. A number of these cases are now pending on our docket. A refusal to accept jurisdiction here would only compound confusion for doctors, their patients, and law enforcement officials. As this case makes abundantly clear, a ruling on the validity of a statute applicable only to the District can contribute to great disparities and confusion in the enforcement of criminal laws. Finally, my Brother HARLAN's dissent also appears to rely on the fact that this Court has never accepted jurisdiction over a direct appeal under the Criminal Appeals Act involving the validity of a District of Columbia statute. *Post,* at 93. Since this Court has never either accepted or rejected jurisdiction of such an appeal, it is difficult to see how the complete absence of precedent in this Court lends any weight whatever to his argument. Neither previous cases nor the purpose behind the Criminal Appeals Act provides any satisfactory reason why the term "statute" should not include those statutes applicable only in the District of Columbia.

One other procedural problem remains. We asked the parties to brief the question whether the Government could have appealed this case to the Court of Appeals for the District of Columbia Circuit under D. C. Code Ann. § 23–105 (Supp. 1970), and, if so, whether we should refuse to entertain the appeal here as a matter of sound judicial administration. That D. C. Code provision states:

> "In all criminal prosecutions the United States . . . shall have the same right of appeal that is given to the defendant . . . ."

The relationship between the Criminal Appeals Act and this Code section was considered in *Carroll* v. *United States,* 354 U. S. 394, 411 (1957), where the Court concluded:

"[C]riminal appeals by the Government in the District of Columbia are not limited to the categories set forth in 18 U. S. C. § 3731 [the Criminal Appeals Act], although as to cases of the type covered by that special jurisdictional statute, its explicit directions will prevail over the general terms of [D. C. Code Ann. § 23–105 (Supp. 1970)]."

Since we have concluded above that this appeal is covered by the Criminal Appeals Act, it would seem to follow from *Carroll* that the Act's provisions control and no appeal could have been taken to the Court of Appeals. Although *Carroll* seems to be dispositive, it has been suggested that it may now be limited by *United States* v. *Sweet,* 399 U. S. 517 (1970), which contains some language suggesting that the Government may be empowered to take an appeal to the Court of Appeals under § 23–105 even when a direct appeal would be proper here under the Criminal Appeals Act. *Id.,* at 518. We do not elaborate upon that suggestion. We only hold that once an appeal is properly here under the Criminal Appeals Act, we should not refuse to consider it because it might have been taken to another court.

## II

We turn now to the merits. Appellee Milan Vuitch was indicted for producing and attempting to produce abortions in violation of D. C. Code Ann. § 22–201. That Act provides in part:

"Whoever, by means of any instrument, medicine, drug or other means whatever, procures or produces, or attempts to procure or produce an abortion or

miscarriage on any woman, unless the same were done as necessary for the preservation of the mother's life or health and under the direction of a competent licensed practitioner of medicine, shall be imprisoned in the penitentiary not less than one year or not more than ten years . . . ."

Without waiting for trial, the District Judge dismissed the indictments on the ground that the abortion statute was unconstitutionally vague. In his view, set out substantially in full below,[3] the statute was vague for two principal reasons:

1. The fact that once an abortion was proved a physician "is presumed guilty and remains so unless a jury

---

[3] The District Judge stated:

"It is suggested that these words ['as necessary for the preservation of the mother's life or health'] are not precise; that, as interpreted, they improperly limit the physician in carrying out his professional responsibilities; and that they interfere with a woman's right to avoid childbirth for any reason. The word 'health' is not defined and in fact remains so vague in its interpretation and the practice under the act that there is no indication whether it includes varying degrees of mental as well as physical health. While the law generally has been careful not to interfere with medical judgment of competent physicians in treatment of individual patients, the physician in this instance is placed in a particularly unconscionable position under the conflicting and inadequate interpretations of the D. C. abortion statute now prevailing. The Court of Appeals established by such early cases as Peckham v. United States, 96 U. S. App. D. C. 312, 226 F. 2d 34 (1955), cert. denied 350 U. S. 912, 76 S. Ct. 195, 100 L. Ed. 800, and Williams v. United States, 78 U. S. App. D. C. 147, 138 F. 2d 81, 153 A. L. R. 1213 (1943), that upon the Government establishing that a physician committed an abortion, the burden shifted to the physician to justify his acts. In other words, he is presumed guilty and remains so unless a jury can be persuaded that his acts were necessary for the preservation of the woman's life or health. These holdings, which may well offend the Fifth Amendment of the Constitution, as interpreted in recent decisions such as Leary v. United States, 395 U. S. 6, 89 S. Ct. 1532, 23 L. Ed. 2d 57 (1969), and United States v. Gainey, 380 U. S. 63, 85 S. Ct. 754, 13

can be persuaded that his acts were necessary for the preservation of the woman's life or health."

2. The presence of the "ambivalent and uncertain word 'health.'"

In concluding that the statute places the burden of persuasion on the defendant once the fact of an abortion has been proved,[4] the court relied on *Williams* v. *United States,* 78 U. S. App. D. C. 147, 138 F. 2d 81 (1943). There the Court of Appeals for the District of Columbia Circuit held that the prosecution was not required to prove as part of its case in chief that the operation was not necessary to preserve life or health. *Id.,* at 147, 149, 138 F. 2d, at 81, 83. The court indicated that once the prosecution established that an abortion had been performed the defendant was required "to come forward with evidence which with or without other evidence is sufficient to create a reasonable doubt of guilt." *Id.,* at 150, 138 F. 2d, at 84. The District Court here appears to have read *Williams* as holding that once an abortion is proved, the burden of persuading the jury that it was legal (*i. e.,* necessary to the preservation of the mother's life or health) is cast upon the physician. Whether or not this is a correct reading of *Williams,* we

---

L. Ed. 2d 658 (1965), also emphasize the lack of necessary precision in this criminal statute. The jury's acceptance or nonacceptance of an individual doctor's interpretation of the ambivalent and uncertain word 'health' should not determine whether he stands convicted of a felony, facing ten years' imprisonment. His professional judgment made in good faith should not be challenged. There is no clear standard to guide either the doctor, the jury or the Court. No body of medical knowledge delineates what degree of mental or physical health or combination of the two is required to make an abortion conducted by a competent physician legal or illegal under the Code. . . ." 305 F. Supp. 1032, 1034.

[4] The trial court also cited *Peckham* v. *United States,* 96 U. S. App. D. C. 312, 226 F. 2d 34 (1955), as dealing with the D. C. abortion law. However, the opinion in that case does not discuss the burden of proof under the statute.

believe it is an erroneous interpretation of the statute. Certainly a statute that outlawed only a limited category of abortions but "presumed" guilt whenever the mere fact of abortion was established, would at the very least present serious constitutional problems under this Court's previous decisions interpreting the Fifth Amendment. *Tot* v. *United States,* 319 U. S. 463 (1943); *Leary* v. *United States,* 395 U. S. 6, 36 (1969). But of course statutes should be construed whenever possible so as to uphold their constitutionality.

The statute does not outlaw all abortions, but only those which are not performed under the direction of a competent, licensed physician, and those not necessary to preserve the mother's life or health. It is a general guide to the interpretation of criminal statutes that when an exception is incorporated in the enacting clause of a statute, the burden is on the prosecution to plead and prove that the defendant is not within the exception. When Congress passed the District of Columbia abortion law in 1901 and amended it in 1953, it expressly authorized physicians to perform such abortions as are necessary to preserve the mother's "life or health." Because abortions were authorized only in more restrictive circumstances under previous D. C. law, the change must represent a judgment by Congress that it is desirable that women be able to obtain abortions needed for the preservation of their lives or health.[5] It would be highly anomalous for a legislature to authorize abortions necessary for life or health and then to demand that a doctor, upon pain of one to ten years' imprisonment, bear the burden of proving that an abortion he performed fell within that category. Placing such a burden of proof

---

[5] Before 1901 the existing statute allowed abortion only "for the purpose of preserving the life of any woman pregnant . . . ." W. Abert & B. Lovejoy, The Compiled Statutes in Force in the District of Columbia, c. XVI, § 15, p. 159 (1894).

on a doctor would be peculiarly inconsistent with society's notions of the responsibilities of the medical profession. Generally, doctors are encouraged by society's expectations, by the strictures of malpractice law and by their own professional standards to give their patients such treatment as is necessary to preserve their health. We are unable to believe that Congress intended that a physician be required to prove his innocence. We therefore hold that under D. C. Code Ann. § 22-201, the burden is on the prosecution to plead and prove that an abortion was not "necessary for the preservation of the mother's life or health."

There remains the contention that the word "health" is so imprecise and has so uncertain a meaning that it fails to inform a defendant of the charge against him and therefore the statute offends the Due Process Clause of the Constitution. See, e. g., *Lanzetta* v. *New Jersey,* 306 U. S. 451 (1939). We hold that it does not. The trial court apparently felt that the term was vague because there "is no indication whether it includes varying degrees of mental as well as physical health." 305 F. Supp., at 1034. It is true that the legislative history of the statute gives no guidance as to whether "health" refers to both a patient's mental and physical state. The term "health" was introduced into the law in 1901 when the statute was enacted in substantially its present form. The House Report [6] on the bill contains no discussion of the term "health" and there was no Senate report. Nor have we found any District of Columbia cases prior to this District Court decision that shed any light on the question. Since that decision, however, the issue has been considered in *Doe* v. *General Hospital of the District of Columbia,* 313 F. Supp. 1170 (DC 1970). There District Judge Waddy construed the statute to

---

[6] H. R. Rep. No. 1017, 56th Cong., 1st Sess.

72

permit abortions "for mental health reasons whether or not the patient had a previous history of mental defects." *Id.*, at 1174–1175. The same construction was followed by the United States Court of Appeals for the District of Columbia Circuit in further proceedings in the same case. 140 U. S. App. D. C. 149 and 153, 434 F. 2d 423 and 427 (1970). We see no reason why this interpretation of the statute should not be followed. Certainly this construction accords with the general usage and modern understanding of the word "health," which includes psychological as well as physical well-being. Indeed Webster's Dictionary, in accord with that common usage, properly defines health as the "[s]tate of being . . . sound in body [or] mind." Viewed in this light, the term "health" presents no problem of vagueness. Indeed, whether a particular operation is necessary for a patient's physical or mental health is a judgment that physicians are obviously called upon to make routinely whenever surgery is considered.[7]

We therefore hold that properly construed the District of Columbia abortion law is not unconstitutionally vague, and that the trial court erred in dismissing the indictments on that ground. Appellee has suggested that there are other reasons why the dismissal of the indictments should be affirmed. Essentially, these arguments

---

[7] Our Brother DOUGLAS appears to fear that juries might convict doctors in any abortion case simply because some jurors believe all abortions are evil. Of course such a danger exists in all criminal cases, not merely those involving abortions. But there are well-established methods defendants may use to protect themselves against such jury prejudice: continuances, changes of venue, challenges to prospective jurors on *voir dire,* and motions to set aside verdicts which may have been produced by prejudice. And of course a court should always set aside a jury verdict of guilt when there is not evidence from which a jury could find a defendant guilty beyond a reasonable doubt.

are based on this Court's decision in *Griswold* v. *Connecticut,* 381 U. S. 479 (1965). Although there was some reference to these arguments in the opinion of the court below, we read it as holding simply that the statute was void for vagueness because it failed in that court's language to "give that certainty which due process of law considers essential in a criminal statute." 305 F. Supp., at 1034. Since that question of vagueness was the only issue passed upon by the District Court it is the only issue we reach here. *United States* v. *Borden Co.,* 308 U. S. 188 (1939); *United States* v. *Petrillo,* 332 U. S. 1 (1947); *United States* v. *Blue,* 384 U. S. 251, 256 (1966).

The judgment is reversed and the case remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE WHITE, concurring.

I join the Court's opinion and judgment. As to the facial vagueness argument, I have these few additional words. This case comes to us unilluminated by facts or record. The District Court's holding that the District of Columbia statute is unconstitutionally vague on its face because it proscribes all abortions except those necessary for the preservation of the mother's life or health was a judgment that the average person could not understand which abortions were permitted and which were prohibited. But surely the statute puts everyone on adequate notice that the health of the mother, whatever that phrase means, is the governing standard. It should also be absolutely clear that a doctor is not free to perform an abortion on request without considering whether the patient's health requires it. No one of average intelligence could believe that under this statute abortions not dictated by health considerations are legal.

Thus even if the "health" standard were unconstitutionally vague, which I agree is not the case, the statute is not void on its face since it reaches a class of cases in which the meaning of "health" is irrelevant and no possible vagueness problem could arise. We do not, of course, know whether this is one of those cases. Until we do facial vagueness claims must fail. Cf. *United States* v. *National Dairy Corp.*, 372 U. S. 29 (1963).

MR. JUSTICE DOUGLAS, dissenting in part.

While I agree with Part I of the Court's opinion that we have jurisdiction over this appeal, I do not think the statute meets the requirements of procedural due process.

The District of Columbia Code makes it a felony for a physician to perform an abortion "unless the same were done as necessary for the preservation of the mother's life or health." D. C. Code Ann. § 22–201 (1967).

I agree with the Court that a physician—within the limits of his own expertise—would be able to say that an abortion at a particular time performed on a designated patient would or would not be necessary for the "preservation" of her "life or health." That judgment, however, is highly subjective, dependent on the training and insight of the particular physician and his standard as to what is "necessary" for the "preservation" of the mother's "life or health."

The answers may well differ, physician to physician. Those trained in conventional obstetrics may have one answer; those with deeper psychiatric insight may have another. Each answer is clear to the particular physician. If we could read the Act as making that determination conclusive, not subject to review by judge and by jury, the case would be simple, as MR. JUSTICE STEWART points out. But that does such violence to the statutory scheme that I believe it is beyond the range of judicial

interpretation so to read the Act. If it is to be revised in that manner, Congress should do it.

Hence I read the Act, as did the District Court, as requiring submission to court and jury of the physician's decision. What will the jury say? The prejudices of jurors are customarily taken care of by challenges for cause and by peremptory challenges. But vagueness of criminal statutes introduces another element that is uncontrollable. Are the concepts so vague that possible offenders have no safe guidelines for their own action? Are the concepts so vague that jurors can give them a gloss and meaning drawn from their own predilections and prejudices? Is the statutory standard so easy to manipulate that although physicians can make good-faith decisions based on the standard, juries can nonetheless make felons out of them?

The Court said in *Lanzetta* v. *New Jersey*, 306 U. S. 451, 453, that a "statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process."

A three-judge court in evaluating a Texas statutory standard as to whether an abortion was attempted "for the purpose of saving the life of the mother" said:

> "How *likely* must death be? Must death be certain if the abortion is not performed? Is it enough that the woman could not undergo birth without an ascertainably higher possibility of death than would normally be the case? What if the woman threatened suicide if the abortion was not performed? How *imminent* must death be if the abortion is not performed? Is it sufficient if having the child will shorten the life of the woman by a number of years?"
> *Roe* v. *Wade*, 314 F. Supp. 1217, 1223.

The *Roe* case was followed by a three-judge court in *Doe* v. *Scott,* 321 F. Supp. 1385, which struck down an Illinois statute which sanctioned an abortion "necessary for the preservation of the woman's life." And see *People* v. *Belous,* 71 Cal. 2d 954, 458 P. 2d 194.

A doctor may well remove an appendix far in advance of rupture in order to prevent a risk that may never materialize. May he act in a similar way under this abortion statute?

May he perform abortions on unmarried women who want to avoid the "stigma" of having an illegitimate child? Is bearing a "stigma" a "health" factor? Only in isolated cases? Or is it such whenever the woman is unmarried?

Is any unwanted pregnancy a "health" factor because it is a source of anxiety?

Is an abortion "necessary" in the statutory sense if the doctor thought that an additional child in a family would unduly tax the mother's physical well-being by reason of the additional work which would be forced upon her?

Would a doctor be violating the law if he performed an abortion because the added expense of another child in the family would drain its resources, leaving an anxious mother with an insufficient budget to buy nutritious food?

Is the fate of an unwanted child or the plight of the family into which it is born relevant to the factor of the mother's "health"?

Mr. Justice Holmes, in holding that "unreasonable" restraint of trade was an adequate constitutional standard of criminality, said in *Nash* v. *United States,* 229 U. S. 373, 377, that "the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he

incur a fine or a short imprisonment, as here; he may incur the penalty of death."

He wrote in a context of economic regulations which are restrained by few, if any, constitutional guarantees.

Where, however, constitutional guarantees are implicated, the standards of certainty are more exacting.

*Winters* v. *New York*, 333 U. S. 507, 514, 519, held void for vagueness a state statute which as construed made it a crime to print stories of crime "so massed as to incite to crime," since such a regulatory scheme trenched on First Amendment rights of the press.

The standard of "sacrilegious" can be used in such an accordion-like way as to infringe on religious rights protected by the First Amendment. *Joseph Burstyn, Inc.* v. *Wilson*, 343 U. S. 495, 505.

The requirement of a "narrowly drawn" statute when the regulation touches a protected constitutional right (*Cantwell* v. *Connecticut*, 310 U. S. 296, 311; *Thornhill* v. *Alabama*, 310 U. S. 88, 100) is only another facet of the void-for-vagueness problem.

What the Court held in *Herndon* v. *Lowry*, 301 U. S. 242, is extremely relevant here. The ban of publications made to incite insurrection was held to suffer the vice of vagueness:

> "The statute, as construed and applied in the appellant's trial, does not furnish a sufficiently ascertainable standard of guilt.
>
> .        .        .        .        .
>
> "Every person who attacks existing conditions, who agitates for a change in the form of government, must take the risk that if a jury should be of opinion he ought to have foreseen that his utterances might contribute in any measure to some future forcible resistance to the existing government he may be convicted of the offense of inciting insurrection. . . . *The law, as thus construed, licenses the jury to cre-*

*ate its own standard in each case."* *Id.,* at 261, 262, 263. (Italics added.)

If these requirements of certainty are not imposed then the triers of fact have "a power to invade imperceptibly (and thus unreviewably) a realm of constitutionally protected personal liberties." Note, The Void-For-Vagueness Doctrine in the Supreme Court, 109 U. Pa. L. Rev. 67, 104 (1960).

Abortion touches intimate affairs of the family, of marriage, of sex, which in *Griswold* v. *Connecticut,* 381 U. S. 479, we held to involve rights associated with several express constitutional rights and which are summed up in "the right of privacy." They include the right to procreate (*Skinner* v. *Oklahoma,* 316 U. S. 535), the right to marry across the color line (*Loving* v. *Virginia,* 388 U. S. 1), the intimate familial relations between children and parents (*Meyer* v. *Nebraska,* 262 U. S. 390; *Levy* v. *Louisiana,* 391 U. S. 68, 71–72). There is a compelling personal interest in marital privacy and in the limitation of family size. And on the other side is the belief of many that the fetus, once formed, is a member of the human family and that mere personal inconvenience cannot justify the fetus' destruction. This is not to say that government is powerless to legislate on abortions. Yet the laws enacted must not trench on constitutional guarantees which they can easily do unless closely confined.

Abortion statutes deal with conduct which is heavily weighted with religious teachings and ethical concepts.[1]

---

[1] "There remains the moral issue of abortion as murder. We submit that this is insoluble, a matter of religious philosophy and religious principle and not a matter of fact. We suggest that those who believe abortion is murder need not avail themselves of it. On the other hand, we do not believe that such conviction should limit the freedom of those not bound by identical religious conviction. Although the moral issue hangs like a threatening cloud over any

Mr. Justice Jackson once spoke of the "treacherous grounds we tread when we undertake to translate ethical concepts into legal ones, case by case." *Jordan* v. *De George,* 341 U. S. 223, 242 (dissenting opinion). The difficulty and danger are compounded when religion adds another layer of prejudice.[2] The end result is that juries condemn what they personally disapprove.

The subject of abortions—like cases involving obscenity [3]—is one of the most inflammatory ones to reach

open discussion of abortion, the moral issuses are not all one-sided. The psychoanalyst Erik Erikson stated the other side well when he suggested that 'The most deadly of all possible sins is the mutilation of a child's spirit.' There can be nothing more destructive to a child's spirit than being unwanted, and there are few things more disruptive to a woman's spirit than being forced without love or need into motherhood." The Right to Abortion: A Psychiatric View 218–219 (Group for the Advancement of Psychiatry, Vol. 7, Pub. No. 75, 1969).

[2] Mr. Justice Clark recently wrote: "Throughout history religious belief has wielded a vital influence on society's attitude regarding abortion. The religious issues involved are perhaps the most frequently debated aspects of abortion. At the center of the ecclesiastical debate is the concept of 'ensoulment' or 'person-hood,' *i. e.,* the time at which the fetus becomes a human organism. The Reverend Joseph F. Donseel of Fordham University admitted that no one can determine with certainty the exact moment at which 'ensoulment' occurs, but we must deal with the moral problems of aborting a fetus even if it has not taken place. Many Roman Catholics believe that the soul is a gift of God given at conception. This leads to the conclusion that aborting a pregnancy at any time amounts to the taking of a human life and is therefore against the will of God. Others, including some Catholics, believe that abortion should be legal until the baby is viable, *i. e.,* able to support itself outside the womb. In balancing the evils, the latter conclude that the evil of destroying the fetus is outweighed by the social evils accompanying forced pregnancy and childbirth." Religion, Morality, and Abortion: A Constitutional Appraisal, 2 Loyola U. L. Rev. (L. A.) 1, 4 (1969).

[3] I have expressed my views on the vagueness of criminal laws governing obscenity in *Dyson* v. *Stein,* 401 U. S. 200, 204 (dissenting opinion). And see the dissent of MR. JUSTICE BLACK in *Ginzburg* v. *United States,* 383 U. S. 463, 476.

the Court. People instantly take sides and the public, from whom juries are drawn, makes up its mind one way or the other before the case is even argued. The interests of the mother and the fetus are opposed. On which side should the State throw its weight? The issue is volatile; and it is resolved by the moral code which an individual has. That means that jurors may give it such meaning as they choose, while physicians are left to operate outside the law. Unless the statutory code of conduct is stable and in very narrow bounds, juries have a wide range and physicians have no reliable guideposts. The words "necessary for the preservation of the mother's life or health" become free-wheeling concepts, too easily taking on meaning from the juror's predilections or religious prejudices.

I would affirm the dismissal of these indictments and leave to the experts the drafting of abortion laws [4] that protect good-faith medical practitioners from the treacheries of the present law.

---

[4] Clark, *supra*, n. 2, at 10–11.

Cf. New York's new abortion law effective July 1, 1970, N. Y. Penal Law § 125.05, subd. 3 (Supp. 1970–1971):

"An abortional act is justifiable when committed upon a female with her consent by a duly licensed physician acting (a) under a reasonable belief that such is necessary to preserve her life, or, (b) within twenty-four weeks from the commencement of her pregnancy. A pregnant female's commission of an abortional act upon herself is justifiable when she acts upon the advice of a duly licensed physician (1) that such act is necessary to preserve her life, or, (2) within twenty-four weeks from the commencement of her pregnancy. The submission by a female to an abortional act is justifiable when she believes that it is being committed by a duly licensed physician, acting under a reasonable belief that such act is necessary to preserve her life, or, within twenty-four weeks from the commencement of her pregnancy." And see Hall, The Truth About Abortion in New York, 13 Columbia Forum, Winter 1970, p. 18; Schwartz, The Abortion Laws, 67 Ohio St. Med. J. 33 (1971).

MR. JUSTICE HARLAN, with whom MR. JUSTICE BREN-
NAN, MR. JUSTICE MARSHALL, and MR. JUSTICE BLACK-
MUN join, dissenting as to jurisdiction.

Appellee Vuitch was indicted in the United States Dis-
trict Court for the District of Columbia for violations
of D. C. Code Ann. § 22–201 (1967), the District of Co-
lumbia abortion statute.   This statute is applicable only
within the District of Columbia.   On pretrial motion by
Vuitch, the indictments were dismissed on the ground
that the abortion statute was unconstitutionally vague.
The United States appealed directly to this Court under
the terms of the Criminal Appeals Act of 1907, 18 U. S. C.
§ 3731, relying on the provision allowing direct appeal
"[f]rom a decision or judgment setting aside, or dismiss-
ing any indictment or information, or any count thereof,
where such decision or judgment is based upon the in-
validity or construction of the statute upon which the
indictment or information is founded." [1]   It is not con-

---

[1] The text of 18 U. S. C. § 3731 was as follows:

"An appeal may be taken by and on behalf of the United States
from the district courts direct to the Supreme Court of the United
States in all criminal cases in the following instances:

"From a decision or judgment setting aside, or dismissing any in-
dictment or information, or any count thereof, where such decision
or judgment is based upon the invalidity or construction of the
statute upon which the indictment or information is founded.

"From a decision arresting a judgment of conviction for insuffi-
ciency of the indictment or information, where such decision is based
upon the invalidity or construction of the statute upon which the
indictment or information is founded.

"From the decision or judgment sustaining a motion in bar, when
the defendant has not been put in jeopardy.

"An appeal may be taken by and on behalf of the United States
from the district courts to a court of appeals in all criminal cases, in
the following instances:

"From a decision or judgment setting aside, or dismissing any in-
dictment or information, or any count thereof except where a direct

tested that, but for this provision of the Criminal Appeals Act, the Government would have a right of appeal to the Court of Appeals for the District of Columbia Circuit under D. C. Code Ann. § 23–105 (Supp. 1970), which provides:

> "In all criminal prosecutions the United States or the District of Columbia, as the case may be, shall have the same right of appeal that is given to the defendant, including the right to a bill of exceptions: *Provided,* That if on such appeal it shall be found

---

appeal to the Supreme Court of the United States is provided by this section.

"From a decision arresting a judgment of conviction except where a direct appeal to the Supreme Court of the United States is provided by this section.

"The appeal in all such cases shall be taken within thirty days after the decision or judgment has been rendered and shall be diligently prosecuted.

"Pending the prosecution and determination of the appeal in the foregoing instances, the defendant shall be admitted to bail on his own recognizance.

"If an appeal shall be taken, pursuant to this section, to the Supreme Court of the United States which, in the opinion of that Court, should have been taken to a court of appeals, the Supreme Court shall remand the case to the court of appeals, which shall then have jurisdiction to hear and determine the same as if the appeal had been taken to that court in the first instance.

"If an appeal shall be taken pursuant to this section to any court of appeals which, in the opinion of such court, should have been taken directly to the Supreme Court of the United States, such court shall certify the case to the Supreme Court of the United States, which shall thereupon have jurisdiction to hear and determine the case to the same extent as if an appeal had been taken directly to that Court."

As noted in *United States* v. *Weller,* 401 U. S. 254 (1971), these provisions were amended by § 14 (a) of the Omnibus Crime Control Act of 1970, 84 Stat. 1890. But cases begun in the District Court before the new statute took effect are not affected. See *United States* v. *Weller, supra,* at 255 n. 1.

that there was error in the rulings of the court during a trial, a verdict in favor of the defendant shall not be set aside."

The Court today—relying on the generic reference to "statutes" and "all criminal cases" in the text of 18 U. S. C. § 3731 and the absence of an express exclusion of statutes applicable only within the District of Columbia—concludes that 18 U. S. C. § 3731 rather than D. C. Code Ann. § 23–105 provides the proper appellate route for this case. I must disagree.

I

The historical development of the Government's right to appeal in criminal cases both in the District of Columbia and throughout the Nation is surveyed in *Carroll* v. *United States,* 354 U. S. 394 (1957). Section 23–105 of the D. C. Code was passed in 1901 as § 935 of the Code of 1901. 31 Stat. 1341. Prior to the Criminal Appeals Act of 1907, the Government had no right of appeal in criminal cases outside of the District of Columbia. To remedy this situation, a bill was introduced in the House of Representatives. That bill practically tracked the language of the D. C. statute, and made no provision for direct appeal to this Court. 40 Cong. Rec. 5408. The accompanying House Report described the bill as follows: "The accompanying bill will extend [§ 935] of the code of the District of Columbia to all districts in the United States." H. R. Rep. No. 2119, 59th Cong., 1st Sess., 2 (1906). That bill passed the House, but the Senate Committee on the Judiciary rejected the House approach of simply extending the provisions of the D. C. appeals statute to the rest of the Nation; the Senate Committee instead substituted a more narrowly drawn measure which enumerated specific substantive categories of crim-

84

inal cases to be appealable by the Government and allocated jurisdiction over these appeals between the Supreme Court and the then Circuit Courts of Appeals according to the allocation of appellate jurisdiction for civil cases established in the Circuit Court of Appeals Act of 1891. S. Rep. No. 3922, 59th Cong., 1st Sess. (1906). See *Carroll* v. *United States, supra,* at 402 n. 11. Even that bill as narrowed could not pass the Senate; it provoked extended debate in which the opponents of the measure focused on the potential for abuse of individual rights arising from repeated court proceedings, delays in appeals, and restraints on personal freedom while the Government prosecuted its appeal. See generally *United States* v. *Sisson,* 399 U. S. 267 (1970). The upshot of these debates was that Senator Nelson, the bill's floor manager in the Senate, agreed to accept a variety of amendments which further narrowed the categories of cases appealable by the Government and made special provision for the defendant's release on his own recognizance. See 41 Cong. Rec. 2818–2825.[2]

It is at this point that Senator Clarke of Arkansas offered an amendment limiting the Government's right to appeal decisions dismissing indictments or arresting judgments for insufficiency of the indictment to instances where the decision was based upon "the invalidity or construction of the statute." The purpose of that amendment was described by Senator Clarke as follows:

> "Mr. President, the object of the amendment is to limit the right of appeal upon the part of the General Government to the validity or constitutionality of the statute in which the prosecution is proceeding. It has been enlarged by the addition of another clause, which gives the right of appeal where the

---

[2] The bill had been amended earlier to require the Government to take an appeal within 30 days. 41 Cong. Rec. 2193–2194.

construction by the trial court is such as to decide that there is no offense committed, notwithstanding the validity of the statute, and in other respects the proceeding may remain intact. I think that is a broad enough right to concede to the General Government in the prosecution of persons in the court.

. . . . .

"In view of the defects that recent years have disclosed, I do not believe it to be sound policy to go beyond the necessities as they have developed defects in our procedure. A case recently occurring has drawn attention to the fact that if a circuit judge or a district judge holding the circuit should determine that a statute of Congress was invalid, the United States is without means of having that matter submitted to a tribunal that under the Constitution has power to settle that question. I do not believe the remedy ought to be any wider than the mischief that has been disclosed. I do not believe that any additional advantages ought to be given to the General Government in the prosecution of persons arraigned in court, but I do believe the paragraph ought to be perfected in that behalf, so as to provide that there shall be an appeal to the court having authority to give uniformity to the practice which shall prevail in all the courts of the United States, and that they shall be ready to say, and say promptly, what the statute means and whether or not it is a valid statute.

. . . . .

"So I think this amendment gives expression to the proposition that the remedy we provide here now should be no wider than the defect that has been disclosed in the preceding criminal procedure; and that is that whenever the validity of a statute has been adversely decided by a trial court, wherever its

unconstitutionality has been pronounced by a trial court, the Government ought to have the right to promptly submit that to the tribunal having authority to dispose of such questions in order that there may be a uniform enforcement of the law throughout the entire limits of the United States.

"This is the purpose I have, Mr. President, and having discussed it with the distinguished Senator from Wisconsin . . . and the distinguished Senator from Minnesota [Mr. NELSON], we agreed that that would probably meet the defect." 41 Cong. Rec. 2819–2820.

See generally 41 Cong. Rec. 2819–2822.

The bill as thus amended passed the Senate; the House disagreed to the Senate amendment, but yielded in conference. The bill in conference was amended to provide for direct appeals to the Supreme Court. See H. R. Conf. Rep. No. 8113, 59th Cong., 2d Sess. (1907). No explanation was given in the conference report for the exclusive direct appeal route.

I draw from these legislative materials the following relevant propositions: (1) The Congress was definitely advertent to the existence of a Governmental appeal right in criminal cases within the District; (2) the Congress explicitly rejected the simple approach of extending the D. C. provision to the Nation; (3) the particular provision of the Act relied on by the Government as supporting its direct appeal in this case was amended with a view to limiting its reach to a relatively precise defect, i. e., the debilitating effect on the enforcement of criminal laws arising from conflicting judicial interpretations; and (4) the substitution of an exclusive direct appeal to this Court, while not expressly explained, is perfectly compatible with the goal of promptly achieving uniformity in construction of statutes applicable nationwide, while at the same time being wholly unnecessary to the resolu-

tion of conflicting district court constructions of local
D. C. statutes, given the existence of a right of appeal to
the Court of Appeals for the District of Columbia Circuit.

## II

The question of overlap between the appellate routes
available to the Government in criminal cases under the
D. C. Code and 18 U. S. C. § 3731 was first dealt with by
this Court in *United States* v. *Burroughs,* 289 U. S. 159
(1933). In *Burroughs* the defendants were indicted in
the then Supreme Court of the District of Columbia for
violation of the Federal Corrupt Practices Act, a statute
of nationwide applicability. They successfully demurred
on two grounds: one involving the construction of the
statute, and the other involving the sufficiency of the
indictment as a pleading. The Government took an ap-
peal to the Court of Appeals for the District of Columbia
under the D. C. appeals statute. The appellate court
certified to this Court the question whether it had juris-
diction over an appeal where a § 3731-type challenge
was joined with a challenge to the sufficiency of the in-
dictment as a pleading. The Court disposed of the
question by holding that the Criminal Appeals Act is
inapplicable to any criminal case appealable under the
provisions of the D. C. Code:

> "*The Criminal Appeals Act, in naming the courts
> from which appeals may be taken to this court,
> employs the phrase 'district courts'; not 'courts of
> the United States,' or 'courts exercising the same
> jurisdiction as district courts.' We need not, how-
> ever, determine whether the statute should be con-
> strued to embrace criminal cases tried in the Su-
> preme Court of the District if § 935 of the District
> Code were not in effect.* That section deals com-
> prehensively with appeals in criminal cases from all
> of the courts of first instance of the District and

confers on the Court of Appeals jurisdiction of appeals by the Government seeking review of the judgments of those courts. The Criminal Appeals Act, on the other hand, affects only certain specified classes of decisions in district courts, contains no repealing clause, and no reference to the courts of the District of Columbia or the territorial courts, upon many of which jurisdiction is conferred by language quite similar to that of the Code of Law of the District. We cannot construe it as impliedly repealing the complete appellate system created for the District of Columbia by § 935 of the Code, in the absence of expression on the part of Congress indicating that purpose. Implied repeals are not favored; and if effect can reasonably be given to both statutes, the presumption is that the earlier is intended to remain in force. . . ." 289 U. S., at 163–164.[3] (Emphasis added.)

The holding in *Burroughs* established a complete separation of the two statutory schemes for Government appeals in criminal cases; the essence of the Court's rationale was a presumption against implied repeals.

In 1942, Congress amended the Criminal Appeals Act to provide for Government appeals to the Courts of Appeals from all decisions dismissing indictments or arresting judgments of convictions except where a right of direct appeal to this Court exists. 56 Stat. 271. The new amendment expressly included the United States Court of Appeals for the District of Columbia Circuit as

---

[3] The Court's opinion characterizes *Burroughs* as having "held only that the term 'district court' in the Criminal Appeals Act did not include the then-existing Supreme Court of the District of Columbia." *Ante*, at 65. As I read the italicized portion of the above-quoted passage, that is the precise question that the *Burroughs* Court concluded it did *not* have to decide, in light of its holding that the Criminal Appeals Act could not, by implication, effect the repeal of § 935 of the District Code.

one of the intermediate appellate tribunals to which the Government could appeal;[4] in addition, the Act added a new provision to the Judicial Code establishing appellate jurisdiction in the then circuit courts of appeals "in criminal cases on appeals taken by the United States in cases where such appeals are permitted by law." 56 Stat. 272. The latter provision also expressly incorporated the United States Court of Appeals for the District of Columbia Circuit.[5] *Ibid.*

The legislative history of the 1942 amendment offers no explication of congressional intent in including the D. C. courts within the Act.[6] It is certain that this amendment generates some form of overlap between the two statutory schemes for Governmental appeals in criminal cases. In *Carroll* v. *United States,* 354 U. S. 394, 411 (1957), the Court recognized the new situation created by the 1942 amendment:

> "It may be concluded, then, that even today criminal appeals by the Government in the District of Columbia are not limited to the categories set forth in 18 U. S. C. § 3731, although as to cases of the type covered by that special jurisdictional statute, its explicit directions will prevail over the general terms of [the D. C. statute] . . . ."

That, however, leaves open the question which cases come within the categories set forth in 18 U. S. C. § 3731.

---

[4] These explicit references were subsequently omitted by amendment in 1949, 63 Stat. 97, which altered the language of the statute to conform to the changed nomenclature of the federal courts.

[5] This last provision was an amendment to 28 U. S. C. § 225 (1940 ed.); see 56 Stat. 272 and *Carroll* v. *United States, supra,* at 398 n. 5.

[6] The focus was on the decision to accord the Government a right of appeal to the courts of appeals where no direct appeal to this Court lay. See H. R. Rep. No. 45, 77th Cong., 1st Sess. (1941); S. Rep. No. 868, 77th Cong., 1st Sess. (1941).

## III

After this Court's holding in *Burroughs,* it was clear that if Congress wished to effectuate any displacement of the pre-1907 route for Government appeals of criminal cases within the District of Columbia, some express manifestation of its intent was required. The 1942 amendment followed the *Burroughs* decision. Since Congress then acted to create some overlap between the two statutes without further limiting the categories of directly appealable criminal cases, it may be argued that we should presume Congress intended, as of 1942, to embrace within the very special appeals procedures of 18 U. S. C. § 3731 criminal cases based upon statutes applicable only within the District.

But that presumption from a completely silent legislative record flies in the face of the principle that statutes creating a right of direct appeal to this Court should be narrowly construed. Cf. *Swift & Co.* v. *Wickham,* 382 U. S. 111, 128–129 (1965); *Florida Lime Growers* v. *Jacobsen,* 362 U. S. 73, 92–93 (1960) (Frankfurter, J., dissenting). And, in light of the legislative history of the 1907 Act and this Court's explicit holding in *Burroughs* that the 1907 Act had no impact on cases appealable under the D. C. provision, it is especially inappropriate to rely on the absence of any further limiting language in the 1942 amendment as a justification for reading the term "statute" as encompassing criminal prosecutions in the District based on local as well as nationwide statutes.

The legislative history of the 1907 Act suggests a perfectly plausible reason for interpreting the language "based upon the invalidity or construction of the statute" as excluding D. C. statutes: that language was put in the Act by Senator Clarke with the express intention of limiting the Act's goal to remedying the precise defect of

inconsistent enforcement of criminal statutes arising from the lack of a Government appeal. The Court of Appeals for the District of Columbia Circuit constitutes a perfectly adequate appellate tribunal for resolving conflicting interpretations given local statutes by judges within the District of Columbia.[7] Where, however, the Government brings a prosecution in the District of Columbia based on a statute of nationwide applicability, the Court of Appeals for the District of Columbia Circuit cannot achieve uniformity in the enforcement of the statute.

As an original proposition, then, a construction of the relevant provisions of the 1907 Act as excluding criminal cases in the District brought under local statutes but including cases brought under nationwide statutes would have been consistent both with the express purpose of Senator Clarke's amendment and the canon of strict construction as applied to direct appeals statutes.[8] But the

---

[7] The Government suggests a construction of the Criminal Appeals Act excluding D. C. statutes would require the Court to exclude other criminal statutes of only limited territorial application, e. g., 18 U. S. C. §§ 1111–1112 (punishing homicide "[w]ithin the special maritime and territorial jurisdiction of the United States"); 18 U. S. C. §§ 1151–1165 (regulating offenses within Indian territory). See Brief for the United States 15–16. But I would not construe 18 U. S. C. § 3731 as excluding D. C. criminal cases punishable under D. C. statutes because they are of limited territorial application; rather, the point is that given the existence of a prior right of Government appeal, the risks of disuniformity which Senator Clarke described the statute as intended to cure do not exist.

[8] The Government suggests, in its Supplemental Memorandum for the United States 6–7, that a construction of the 1907 Act excluding statutes applicable only within the District of Columbia from the scope of the first two provisions leads to the "anomalous consequence" that 18 U. S. C. § 3731 would still allow a direct appeal in a D. C. case where the motion-in-bar provision is concerned. E. g., United States v. Sweet, 399 U. S. 517 (1970). The alleged "anomaly" would seem to argue for the conclusion that D. C. cases involving the motion-in-bar provision are not directly appealable

Court in *Burroughs* took the position that Congress could not displace the pre-existing appellate route to any extent without indicating an express intent to do so; *Burroughs*, significantly, involved a prosecution under a statute of nationwide applicability. Subsequently, Congress did expressly indicate an intent to displace the alternative appellate route available within the District. The extent of that displacement, I think, should now be measured by the express goal of the relevant provision of the 1907 Act, as limited by Senator Clarke: avoidance of inconsistent enforcement of criminal laws. That theory of legislative purpose—combined with the *Burroughs* holding that Congress should be required to affirmatively indicate an intent to displace the prior appellate route—yields an interpretation of the 1907 Act as amended in 1942 which is consistent with the canon of strict construction generally applied to direct appeals statutes.[9]

here, either. Certainly, the Court's disposition in *Sweet* would not foreclose that result.

In any event, the purpose Senator Clarke had in mind in offering his limiting amendment with regard to the first two provisions of 18 U. S. C. § 3731 was rather clearly expressed; that he failed to address himself to the motion-in-bar provision—which, after all, received very little attention in the prolonged debates on the floor of the Senate—hardly justifies an expansive reading of the other provisions of the Act.

[9] The Government relies principally on *Shapiro* v. *Thompson*, 394 U. S. 618, 625 n. 4 (1969), as supporting its construction of the generic reference to "statutes" in 18 U. S. C. § 3731 to include statutes applicable only within the District of Columbia. *Shapiro* dealt with 28 U. S. C. § 2282, which requires a three-judge court to hear requests for injunctions against the enforcement of "any Act of Congress" when the ground for the requested relief is the alleged unconstitutionality of the Act. Decisions of such three-judge courts are, under the circumstances set forth in 28 U. S. C. § 1253, directly appealable to this Court. In *Shapiro,* the Court noted at least one prior instance where the Court had taken jurisdiction over a case involving a statute applicable only within the District and then stated: "Section 2282 requires a three-judge court to hear a

# IV

I have little doubt that, had the Criminal Appeals Act not been recently amended to dispense with direct appeals to this Court, see n. 1, *supra,* the interpretation of the Act I have suggested would be adopted by the Court. This Court has never taken jurisdiction over a direct appeal from a dismissal of a prosecution brought in the District of Columbia for violation of a statute applicable within the District. It is worth noting that, given the

---

challenge to the constitutionality of '*any* Act of Congress.' We see no reason to make an exception for Acts of Congress pertaining to the District of Columbia." 394 U. S., at 625 n. 4 (emphasis in original).

The *Shapiro* approach is obviously inappropriate for the present problem. First, despite the Government's assertion to the contrary, see Brief for the United States 15, the phrase *"any* Act of Congress" is arguably broader than a generic reference to "statutes." Indeed, the *Shapiro* Court explicitly chose to emphasize the presence of the word "any" in the relevant portion of that statute. Second, while an exercise of jurisdiction in a case where jurisdiction is not challenged is of little precedential value, the Court in *Shapiro* still chose to take note of such a prior case; in the present context, this Court has never taken jurisdiction of a § 3731 appeal involving a statute applicable only within the District.

Third, and most importantly, Congress at the time of the three-judge court Acts altered the principles of both original and appellate jurisdiction for the substantive categories of litigation involved; the new procedural routes reflect crucial considerations of comity between sovereigns and among the branches of the Federal Government. See generally Currie, The Three-Judge District Court in Constitutional Litigation, 32 U. Chi. L. Rev. 1 (1964). There is no legislative history supporting the notion that the new procedures were narrowed to alleviate particular defects of inconsistent constitutional interpretation due to the absence of any appellate route for the substantive categories of cases to be included within the Act.

In these circumstances, it is fair to conclude that the principle of strict construction applicable to such statutes must yield to the "inert language" of the statute. Cf. *Florida Lime Growers* v. *Jacobsen,* 362 U. S. 73, 92 (1960) (Frankfurter, J., dissenting).

Court's adherence to the principles of *Carroll* v. *United States, supra,* the rather absurd waste of our judicial resources on cases such as *United States* v. *Waters,* 175 F. 2d 340, appeal dismissed on motion of the United States, 335 U. S. 869 (1948), and *United States* v. *Sweet,* 399 U. S. 517 (1970), see n. 8, *supra,* could not even be avoided by the exercise of governmental discretion in choosing appellate routes. In light of *Carroll,* I cannot believe that a perfectly acceptable reading of congressional purpose underpinning the definition of categories of cases directly appealable under 18 U. S. C. § 3731 which excludes statutes applicable only within the District of Columbia would have been turned down by the Court.

Of course, the recent elimination of the direct appeal route removes a great deal of the incentive to continue the stringent standards of construction with respect to this statute that have traditionally prevailed in this Court. Indeed, at this stage of the game, the canon of strict construction produces the ironic result of compelling a relatively greater expenditure of judicial energies in assessing our jurisdiction over the remainder of the criminal cases pending in the district courts of the Nation at the time of the most recent amendment than would be involved in deciding those cases on the merits. Nonetheless, this very Term we have indicated that we intend to adhere to the rules of construction evolved by this Court during the long and tortuous history of this statute. *United States* v. *Weller,* 401 U. S. 254 (1971).

The only response we are offered to the reading of congressional purpose I have suggested is that the interests of avoiding inconsistent enforcement of criminal laws argues for exercising jurisdiction over this case because similar statutes in other jurisdictions are under attack on vagueness grounds. See the Court's opinion, at 65–66. Surely those of my Brethren who subscribe to the views

on jurisdiction expressed in the opinion of the Court must recognize that we cannot limit the category of appealable cases under this provision of the Act to prosecutions brought under D. C. statutes which are (a) duplicated in other jurisdictions, and (b) under attack on similar federal question grounds in other jurisdictions. The proffered response is, therefore, not truly a reason for concluding we have jurisdiction over the relevant category of cases; rather, it is a reason for exercising our power in this one case to settle Dr. Vuitch's vagueness claim in spite of the absence of the jurisdictional prerequisites which legitimize the exercise of that judicial power.

## V

Having concluded that the Government cannot directly appeal the dismissal of the indictments to this Court under the provisions of 18 U. S. C. § 3731, it also follows that we cannot utilize the remand provisions of that statute to reroute the appeal to the Court of Appeals for the District of Columbia Circuit. However, we do have jurisdiction to determine our jurisdiction, and, in the analogous three-judge court situation where an alternative appellate route exists but the statute according this Court direct jurisdiction over the certain appeals includes no remand procedure, this Court has vacated the judgment of the court of original jurisdiction and remanded the case to that court for the entry of a fresh decree from which timely appeal may be taken to the proper appellate tribunal. *Rockefeller* v. *Catholic Medical Center of Brooklyn & Queens,* 397 U. S. 820 (1970). The instant case, of course, is a criminal prosecution, and there is a consideration not present in the three-judge court situation: *i. e.,* the additional anxiety caused the defendant by virtue of the Government's erroneous choice of appellate routes. But, while 18 U. S. C. § 3731

cannot empower us to transfer the case, that statute is still relevant as an expression of congressional policy to save the Government's appeal where an erroneous choice of appellate routes is made, even at the expense of additional anxiety to the defendant. Accordingly, I think the proper disposition of this case would be to vacate the judgment of the District Court and remand the case for the entry of a fresh judgment from which the Government could take a timely appeal to the Court of Appeals for the District of Columbia Circuit pursuant to D. C. Code Ann. § 23–105.

## VI

Notwithstanding the views on jurisdiction expressed above, and speaking only for myself, and not for those of my Brethren who agree with my discussion of the jurisdictional issue in this case, I have concluded, substantially for the reasons set forth in MR. JUSTICE BLACKMUN's separate opinion, that I should also reach the merits. Accordingly, I concur in Part II of the Court's opinion and the judgment of the Court.

MR. JUSTICE STEWART, dissenting in part.

I agree that we have jurisdiction of this appeal for the reasons stated in Part I of the Court's opinion.

As to the merits of this controversy, I share at least some of the constitutional doubts about the abortion statute expressed by the District Court. But, as this Court today correctly points out, "statutes should be construed whenever possible so as to uphold their constitutionality." The statute before us can be so construed, I think, simply by extending the reasoning of the Court's opinion to its logical conclusion.

The statute legalizes any abortion performed "under the direction of a competent licensed practitioner of medicine" if "necessary for the preservation of the mother's life or health." Under the statute, therefore,

the legal practice of medicine in the District of Columbia includes the performing of abortions. For the practice of medicine consists of doing those things which, in the judgment of a physician, are necessary to preserve a patient's life or health. As the Court says, "whether a particular operation is necessary for a patient's physical or mental health is a judgment that physicians are obviously called upon to make routinely whenever surgery is considered."

It follows, I think, that when a physician has exercised his judgment in favor of performing an abortion, he has, by hypothesis, not violated the statute. To put it another way, I think the question of whether the performance of an abortion is "necessary for the . . . mother's life or health" is entrusted under the statute exclusively to those licensed to practice medicine, without the overhanging risk of incurring criminal liability at the hands of a second-guessing lay jury. I would hold, therefore, that "a competent licensed practitioner of medicine" is wholly immune from being charged with the commission of a criminal offense under this law.

It is true that the statute can be construed in other ways, as MR. JUSTICE DOUGLAS has made clear. But I would give it the reading I have indicated "in the candid service of avoiding a serious constitutional doubt." *United States* v. *Rumely,* 345 U. S. 41, 47.

MR. JUSTICE BLACKMUN.

Although I join MR. JUSTICE HARLAN in his conclusion that this case is not properly here by direct appeal under 18 U. S. C. § 3731, a majority, and thus the Court, holds otherwise. The case is therefore here and requires decision.

The five Justices constituting the majority, however, are divided on the merits. One feels that D. C. Code Ann. § 22–201 (1967) lacks the requirements of proce-

dural due process and would affirm the dismissal of the indictments. One would hold that a licensed physician is immune from charge under the statute. Three would hold that, properly construed, the statute is not unconstitutionally vague and that the dismissal of the indictments on that ground was error.

Because of the inability of the jurisdictional-issue majority to agree upon the disposition of the case, I feel obligated not to remain silent as to the merits. See *Screws* v. *United States,* 325 U. S. 91, 134 (1945) (addendum by Mr. Justice Rutledge); *United States* v. *Jorn,* 400 U. S. 470, 487–488 (1971) (statement of BLACK and BRENNAN, JJ.); *Mills* v. *Alabama,* 384 U. S. 214, 222–223 (1966) (separate opinion of HARLAN, J.); *Kesler* v. *Department of Public Safety,* 369 U. S. 153, 174, 179 (1962) (STEWART, J., concurring in part, and Warren, C. J., dissenting). Assuming, as I must in the light of the Court's decision, that the Court does have jurisdiction of the appeal, I join Part II of MR. JUSTICE BLACK's opinion and the judgment of the Court.